No. 13          September 24, 2020          223

IN THE OREGON TAX COURT
REGULAR DIVISION

Jerry M. LINSTROM,
*Plaintiff*,

*v.*

DEPARTMENT OF REVENUE,
*Defendant,*
*and*

LINCOLN COUNTY ASSESSOR,
*Defendant-Intervenor.*

(TC 5349 & TC 5359)

At trial, Plaintiff sought a reduction of the real market value (RMV) and maximum assessed value (MAV) of a parcel of riverfront property. As the party challenging the assessment, it was Plaintiff's burden to prove that the RMV and MAV were lower for the years at issue. ORS 305.427. Due to oversights and errors in the appraisal and testimony of Plaintiff's expert witness, the court concluded that Plaintiff did not meet his burden to prove that the property's RMV was lower than the values supported by the county's appraisal. The court further concluded that Plaintiff did not meet his burden of proof regarding a lower MAV due to reduced square footage of the property because he did not meet the deadline for submitting evidence and reasoning to the county under ORS 311.234(2). Finally, the court concluded that Plaintiff missed the deadline under ORS 308.146(8) to assert a MAV reduction on the ground of a physical removal of a building. Therefore, the court upheld the assessor's RMV and MAV of the property.

Trial was held September 26 and 27, 2019, in the courtroom of the Oregon Tax Court, Salem. Trial was concluded by telephone on October 7, 2019.

Plaintiff Jerry M. Linstrom argued the cause *pro se*.

Kristin H. Yuille, Assistant Lincoln County Counsel, Newport, argued the cause for Defendant-Intervenor Lincoln County Assessor.

Decision for Defendants rendered September 24, 2020.

**ROBERT T. MANICKE, Judge.**

Plaintiff Jerry M. Linstrom (Plaintiff) appeals the real market value (RMV) and maximum assessed value (MAV) of a parcel of riverfront property on the Siletz River in Lincoln County (the "Property"). Defendant-Intervenor

Lincoln County Assessor (the County) asks the court to sustain the values on the tax roll. A trial was held at the Oregon Tax Court on September 26 and 27, 2019, and continued by telephone on October 7, 2019. Ric Becker, an Oregon Certified Residential Appraiser under ORS 674.100, testified on behalf of Plaintiff. Nick Kolen, an Oregon Registered Appraiser under ORS 308.010, testified on behalf of the County. The tax years at issue are 2017-18 and 2018-19, and the corresponding assessment dates are January 1, 2017, and January 1, 2018.

## I.   INTRODUCTION

The following facts are uncontested and apply for all relevant times.[1] The Property was originally two separate tax lots, numbered 301 and 501. Plaintiff purchased tax lot 501 in October 2014 for $30,000 and Plaintiff purchased tax lot 301 on April 8, 2015 for $35,000.[2] Sometime before 2017, the two were combined into a single tax lot under lot number 301. The Property contains hook-ups for water and electricity but does not qualify for an onsite septic permit. The County admits that the Property is "likely not able to obtain septic approval ***." The Property includes the following improvements: a dock or deck with a ramp (Dock 1), a fir dock or deck (Dock 2), and a multi-purpose shed. Prior to tax year 2017-18 , the Property included a structure that the Plaintiff refers to alternately as a "boathouse," "detached garage," or "boat garage," and that the County refers to as a "boathouse," "detached garage," or "floating home."

In Case No. TC 5349, for tax year 2017-18, Plaintiff appeals from a Magistrate Division decision sustaining the values on the roll: $73,190 RMV and $117,770 MAV. In Case No. TC 5359, for tax year 2018-19, Plaintiff appealed to the Magistrate Division from an order of the Lincoln County Board of Property Tax Appeals, which determined an RMV of $80,380 and a MAV of $114,890. At Plaintiff's request,

---

[1] The discussion of MAV issues below includes additional facts related specifically to those issues.

[2] The parties give different dates for Plaintiff's purchase of tax lot 501: Plaintiff states that he purchased tax lot 501 on October 30, 2014, and the County states that Plaintiff purchased tax lot 501 on October 14, 2014. The exact date in October that Plaintiff purchased tax lot 501 is not material to this case.

on April 23, 2019, the court specially designated Plaintiff's 2018-19 appeal for hearing in this division and consolidated the cases.

Plaintiff requests, for both tax years, an RMV of $48,000 and a MAV of $65,000. The County requests, for tax year 2017-18, an RMV of $73,190 and a MAV of $117,770. The County requests, for tax year 2018-19, an RMV of $80,380 and a MAV of $114,890.

## II.   ISSUES

What are the RMV and MAV of the Property for tax years 2017-18 and 2018-19?

## III.   ANALYSIS

A.   *Highest and Best Use of the Property*

The court's first task is to determine the highest and best use of the Property. *See Freedom Fed. Savings and Loan v. Dept. of Rev.*, 310 Or 723, 727, 801 P2d 809 (1990) ("The *first* issue is the highest and best use of the property; the *second* issue is the market value of the property at that use." (Emphases in original.)). The Department of Revenue (department) has defined the highest and best use of property as "the reasonably probable use *** that is legally permissible, physically possible, financially feasible, and maximally productive, which results in the highest real market value. OAR 150-308-0240(1)(e); *see Norpac Foods, Inc. v. Dept. of Rev.*, 18 OTR 41, 46-47 (2004) (commenting on role of department rules under ORS 308.205(2)[3]).

The court starts with the parties' positions regarding highest and best use. Each assessor is required to record the highest and best use of each parcel on the annual property tax roll, using a classification system set forth in an administrative rule of the Department of Revenue. *See* ORS 308.215(3) (authorizing Department of Revenue to prescribe information required to be recorded on roll); OAR 150-308-0310(3) requiring assessor to record property classification), (7) (defining classification as based on property's "highest and best use"), (8) (listing classification codes and

---

[3] The court's references to the Oregon Revised Statutes (ORS) are to 2016.

descriptions). For each of the subject years, the County classified the Property under classification code 4-0-1, which the rule describes as follows: "*Tract property* is parcels of varying sizes of improved acreage where the highest and best use is for a suburban or rural homesite, but the land is not divided into urban-type lots." (Emphasis in original.) Plaintiff disputes this classification on the ground that the site of the Property is "unbuildable." Plaintiff asks the court to order the County to change the Property to either class 8-0-0 "recreation land" ("unimproved land that has recreational use as its highest and best use"), or to class 8-0-1 "recreation property" ("improved property that provides recreational opportunity as its highest and best use"). The County denies that its classification is incorrect.

Plaintiff's requested classification of "recreation property" may well be more appropriate than the classification "rural homesite," based solely on the descriptions in the administrative rule. The evidence shows that the Property is a rural waterfront lot of sufficient size for a dwelling but with significant barriers to development for residential use. Plaintiff's contention that the lot is "unbuildable" is supported by testimony of his expert Becker that no public sewer system exists in the area, as well as letters from county officials to the effect that the Property's setback from the river is too small to allow an onsite septic system, that the owner would need to seek an easement from a neighbor to place a drainfield on neighboring property (or obtain a variance from the Oregon Department of Environmental Quality), and that no building permit would issue absent approval for a septic system. The parties presented no evidence whether adjacent properties exist and, if so, whether their owners would be likely to grant an easement. Becker also testified that the narrow shape of the Property and its location on the Siletz Highway would make building any kind of residential structure very difficult. The County did not refute any of these contentions and admitted in its Answer for tax year 2017-18 that the Property is "likely not able to obtain septic approval ***." The County presented some evidence that a structure it refers to variously as a "boathouse," a "detached garage," a "floating home," or a "cabin" was, at least at some point, permitted at the site. However, even if

some kind of floating or other structure was present on the Property before the subject years, the County presented no evidence that a septic drainfield had been approved, or that any such structure could be permitted without access to a septic or sewer system.

Based on the evidence, the court concludes that the highest and best use of the Property is for recreation purposes, such as day use or camping, rather than as a site for a home or other dwelling.

B.   *Effect of County's Determination of Highest and Best Use and Classification of the Property*

Before analyzing the Property's RMV, the court pauses to consider Plaintiff's request that the court order the County to change the classification on the roll. The court looks to the record for evidence that any misclassification affected the evidence at trial, specifically whether the classification affected (1) the County's selection of properties it considered comparable to the Property in the County's appraisal; (2) the County's time-based adjustments to the sales prices of the properties it selected as comparable to the Property; and (3) the County's analysis of an appropriate time-based adjustment for the Property itself from the dates of Plaintiff's purchase of the two lots in 2014 and 2015.

As to the selection of comparables, Plaintiff points to no evidence that the County relied on the Property's class in selecting other properties for comparison in the appraisal report the County presented at trial. As will be discussed below, all of the properties that the County considered comparable, like most of those that Plaintiff used, were bare land or land with minor improvements other than a dwelling. To the extent that either party selected a property with access to sewer or a septic system, that party adjusted the value downward, and the parties' respective amounts of the downward adjustments were similar. The class recorded on the roll is not binding on the court, and the court finds no evidence that the class affected either party's selection of comparison properties.

As to the time-based adjustments, the court starts with background. Each year, an assessor is required to

conduct a "ratio study" based on property sales data the assessor collects during the calendar year. ORS 309.200(2). Among other things, the ratio study estimates the "percentage relationship between the total prior year's real market value of each class of taxable property on the prior assessment roll and the total current real market value of the same properties in each class on the current assessment roll." OAR 150-309-0230(12)(a). This year-to-year comparison is a tool that allows an assessor to annually estimate the value of properties as of the prescribed time of 1:00 a.m. on January 1 based on trends apparent in the study, as opposed to viewing and studying each property individually at that hour. *See* ORS 308.210(1) (requiring assessor to record value "as of" that date and time). A separate ratio study is required for each property class.

In this case, the County used data from its ratio study for each tax year when preparing its appraisal. Since none of Kolen's comparison properties was sold at precisely 1:00 a.m. on January 1, Kolen used the same percentage value change determined for the ratio study to "trend" the value of each comparable property from the date of actual sale forward or backward to the January 1 assessment date. Because an assessor prepares a separate ratio study for each class of property, it is theoretically possible that Kolen's selection of an incorrect class for the Property may have led to an incorrect percentage value change for trending purposes and thus to an incorrect value indicator for each comparable property. However, Plaintiff put forward no evidence that any misclassification distorted Kolen's value indicator for any comparable property. In fact, Plaintiff's expert, Becker, purported to make *no* adjustment for time in his appraisal; in his view, no time trending would have been appropriate because the value of bare land did not appreciate in Lincoln County. In all but three instances, Kolen's time trend adjustments *benefited* taxpayer by reducing the prices of the comparable sales.[4] Plaintiff did not cross-examine Kolen on the data the County used in its ratio studies, nor did Plaintiff

---

[4] If the court were to ignore Kolen's time trend adjustments in the County's appraisal, the adjusted sale prices of seven of the 10 comparable properties would be significantly higher than the value indicator that the County actually concluded.

provide the court with alternative ratio studies incorporating the Plaintiff's preferred property classification. The court concludes that Plaintiff has not carried his burden of proving any distortion in the County's appraisal due to any property misclassification.

Finally, for the same reasons, it is theoretically possible that Kolen's selection of a particular property ratio study, based on property class, may have affected the value he assigned to the Property based on trending forward from the prices Plaintiff paid for the Property in 2014 and 2015. However, as discussed below, for unrelated reasons the court assigns no weight to the County's trended sale price for the Property.

Based on this analysis, the court sees no point in ordering the County to change the Property's classification for either of the tax years at issue, and the court declines to do so. Nothing in this opinion should be read to preclude the County from changing the property classification of the Property for any later year, however. *See* OAR 150-308-0310(3) ("[t]he assessor must maintain the proper classification on each parcel of property"); OAR 150-311-0170(h) (permitting the assessor to correct a property classification and trend factor on the roll "at any time").

C.  *Real Market Value*

Real market value is defined in ORS 308.205(1):

"Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

The real market value of property "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." ORS 308.205(2). The three traditional approaches to calculate RMV are the cost approach, the sales comparison approach, and the income approach. OAR 150-308-0240(2)(a); *see also Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003). "The cost approach estimates value from the cost that would be needed to construct a similar property; the income approach estimates value from the income that the property could be expected

to generate; and the comparable sales approach estimates value from the prices paid for similar properties." *Dept. of Rev. v. River's Edge Investments, LLC*, 359 Or 822, 827, 377 P3d 540 (2016) (citation omitted). An appraisal must consider all three approaches to calculate RMV although all three approaches may not be applicable in each case. *Id*.

Plaintiff's appraiser, Becker, considered all three approaches to value but concluded that the sales comparison approach represents the most accurate method for valuing vacant sites with minimal improvements. Becker did not view the cost approach as applicable because the Property is a vacant lot with limited physical improvements lacking measurable accrued depreciation. He concluded that the income approach is inapplicable as well, because the Property is not used to generate rental income. The County likewise presented evidence solely on the sales comparison approach. The court agrees with the parties that the sales comparison approach is the only method entitled to weight in this case.

D.   *Sales Comparison Approach*

Under the sales comparison approach, the value of a property is derived by "comparing properties similar to the subject property that have recently sold, are listed for sale, or are under contract ***." Appraisal Institute, *The Appraisal of Real Estate* 377 (14th ed 2013). The selection of properties for comparison is based on many factors, and adjustments are made for any differences between the comparable properties and the subject property so that the appraiser can derive a value for the subject property. *Magno v. Dept. of Rev.*, 19 OTR 51, 58-59 (2006).

1.   *Plaintiff's value analysis*

Plaintiff submitted two appraisal reports, one for each tax year at issue. Each analyzed six properties that Becker considered comparable to the Property. For each year, several of his selected properties derived from a "greatly expanded market area" of up to 34 miles from the Property. He adjusted the comparable sales for location, view, lot size, improvements, utilities and detriments. He adjusted for lot size at a set rate of $2.00 per square foot using data from

matched pairing of market sales in Lincoln County.[5] Becker also used matched paired sales to determine the amount to adjust for sewer and water utilities, and the river and forest views. When he observed no market detriments, Becker adjusted the comparable sales based on a hypothetical buyer's perception of the property, using his own market data for support.

Becker did not believe the Property warranted an adjustment for time of sale. He testified that the Property's marketability was adversely impacted by the large number of vacant lots for sale in Lincoln County, making any upward trending adjustment for market value "ludicrous." A time adjustment for the Property was not warranted, Becker explained, because low-priced improved single-family residences were the only properties on the coast that had appreciated in value. Becker testified that due to oversupply, the owners of vacant coastal properties are "desperate to get that property sold." Becker testified that he considered the improvements to be of minimal value to the Property because it is "almost impossible" to determine added market value for improvements based on matched pairing of sales.

a.    Tax year 2017-18

For the earlier of the two tax years (2017-18), Becker valued the Property as of February 3, 2018.[6] Two of his comparable sales are of riverfront property; the remaining four properties are located near a creek or river. The properties include minimal improvement or structures.

---

[5] Becker testified that "matched pairing of sales" is one methodology that appraisers use to determine the appropriate value of the adjustment between comparable sales. Becker explained that this method involves putting a series of recent property sales in a grid format, which allows him to isolate all other factors of that sale and determine the amount the market pays for the adjustment. Becker told the court that he updates the sales used in his matched pairing sales twice a year. Becker did not produce evidence of the matched pairing sales he relied on to determine a land size adjustment value of $2.00 per square foot.

[6] At trial, Becker seemed unaware that, for property tax purposes, the relevant date for valuation is the January 1 preceding the July 1 to June 30 tax year. *See* ORS 308.210(1). Becker's appraisal report for tax year 2017-18 listed an effective date of February 3, 2019. Page 8 of the same report listed an effective date of March 18, 2019. Becker testified that he intended the effective date of his appraisal for tax year 2017-18 to be February 3, 2018.

Comparable B1 (2018) is located 0.68 miles from the Property,[7] making it the closest to the Property. It is located near a river and sold on February 3, 2017, for $32,000. Becker adjusted Comparable B1 downward $5,500, resulting in a value indicator for the Property of $26,500. Comparable sales B2 (2018) through B4 (2018) are all creekfront properties.[8] Comparable B2 (2018) sold on August 9, 2017 for $38,500 and is located 9.48 miles from the Property. Becker adjusted downward $5,500, resulting in a value indicator of $33,500. Comparable B3 (2018) is located 9.16 miles from the Property and sold for $19,000 on January 1, 2018. It is slightly larger than the Property and has street access to water and electricity. Becker adjusted the property upward $11,000, for a value indicator of $30,000. Comparable B4 (2018) sold for $22,500 on November 8, 2017. It is located 9.33 miles from the Property. Becker adjusted the property upward $3,500, for a value indicator of $26,000.

Comparable B5 (2018) and Comparable B6 (2018) are the only two riverfront properties in Becker's appraisal for tax year 2017-18. Comparable B5 (2018) sold for $98,000 on May 31, 2017. It is similar in size to the Property, but it is located 33.59 miles from the Property and includes a mobile home requiring demolition. Becker adjusted Comparable B5 (2018) downward $23,000 for a value indicator of $75,000. Comparable B6 (2018) is located 21.91 miles from the Property in the town of Pacific City. It sold for $120,000 on January 28, 2017. Becker testified that he included Comparable B6 as a "bracket" to the size of the Property. Becker adjusted Comparable B6 (2018) downward $52,500 for a value indicator of $67,500.[9] Becker testified that he did not consider Comparable B5 (2018) and Comparable B6 (2018) good comparable sales because of their distance from the Property but he included both for additional support

---

[7] The court includes the year of the appraisal report to distinguish between the comparable sales in Becker's reports for tax year 2017-18 and tax year 2018-19.

[8] Becker adjusted the creekfront properties because his market sales showed that a typical market buyer views creekfront property as inferior to riverfront property.

[9] As discussed below, Becker also included Comparable B6 (2018) in his appraisal for tax year 2018-19 but reached a different value indicator for that year.

from the adjustments on the comparable sales. Weighing the adjusted values of the six comparable properties, Becker valued the Property at $32,000 as of February 4, 2018.

### b.   Tax year 2018-19

Becker used six comparable sales to determine the RMV of the Property as of February 4, 2019. Four of the comparable properties are riverfront property; the other two are located near a creek or river. Five include improvements or structures; one is vacant land. Comparable B1 (2019) sold for $69,000 on October 22, 2018. It is located 11.16 miles from the Property on the Salmon River. Unlike the Property, Comparable B1 (2019) is vacant land with no structural improvements. Becker adjusted downward $16,500, concluding a value indicator of $52,500.[10] Comparable B2 (2019) sold for $35,000 on December 3, 2018. It is nonriverfront property located 8.86 miles from the Property and includes a cabin requiring demolition. Becker adjusted upward $11,500, for a value indicator of $46,500. Comparable B3 (2019) sold for $50,500 on August 29, 2018. It is riverfront property located 3.47 miles from the Property and has improvements, including a shed with a toilet, dock pilings, and a septic system. Becker adjusted downward $21,000 for a value indicator of $29,500. Comparable B4 (2019) is the same property used in Comparable B1 (2018); the property sold twice: on February 3, 2017, for $32,000 and on January 4, 2019, for $50,000. As he did for tax year 2017-18, Becker adjusted Comparable B1 (2018) downward by a net amount of $5,500, but Becker reached the same net downward adjustment two different ways.[11] His value indicator for tax year 2018-19 was $44,500, reflecting the higher sale price for that year. Comparable B5 (2019) sold for $95,000 on June 1, 2018. It is riverfront

---

[10] Becker noted on cross-examination that the revised adjusted value of Comparable B1 (2019) should be $62,500 because at the time he made this comparable he did not realize the Plaintiff had access to water on the Property.

[11] For tax year 2017-18, Becker adjusted the property upward $20,000 for its inferior nonriverfront location; downward $5,500 for lot size difference; downward $10,000 for water and septic; and downward $10,000 for lack of detriments. For tax year 2018-19 Becker adjusted the property upward $25,000 for nonriverfront location; upward $10,000 for its view of the woods and neighborhood; downward $10,000 for an improvement consisting of a shop; and upward $25,000 for septic, city water access, and lack of detriments, resulting in a net adjustment downward of $5,500.

property located 2.95 miles from the Property and includes a dock, a ramp, and a shed. Becker adjusted downward $42,000, for a value indicator of $53,000.

Comparable B6 (2019) and Comparable B5 (2018) are the same property *and* the same transaction, a sale for $98,000 on May 31, 2017. As discussed above, for tax year 2017-18, Becker concluded a value indicator for Comparable B5 (2018) of $75,000. However, for tax year 2018-19 he concluded a value indicator of $58,000 for the same property, this time identified as Comparable B6 (2019). He made different adjustments for each year. For tax year 2018-19 he adjusted downward $20,000 for a mobile home, dock, and deck, but he did not adjust for any improvements for tax year 2017-18. For tax year 2017-18, he adjusted downward $3,000 for land square footage, but he did not adjust for land square footage for tax year 2018-19. On cross-examination, Becker acknowledged that he had failed to realize that he had used the same comparable property and transaction twice in his written reports but had made different adjustments and reached different conclusions; he testified that he should have applied a downward adjustment of $20,000 to Comparable B5 (2018) for the dock, mobile home, and deck and should have found a value indicator of $55,000 for that year. Weighing the values of these six adjusted comparable sales and comparing them to the Property, Becker valued the Property at $43,000 as of February 4, 2019.[12]

The County asserts that Plaintiff's valuations are inaccurate because Becker chose mostly nonriverfront properties located at a significant distance from the Property subject to different market conditions. The County argues that Becker erred in several of his adjustments and that key adjustments he did make, for "non-riverfront," "creekfront," "no frontage at all," and "view," were not standardized across each comparable nor supported by evidence.

---

[12] Becker testified that his 2018-19 value needed to be amended because at the time he conducted that comparable sales analysis he was not aware that the Property did have access to water. Plaintiff requested the court accept a higher amended value of the Property for 2018-19 that corrected for Becker's error. The court declined to enter Plaintiff's higher amended valuation for tax year 2018-19 into evidence because Plaintiff had not exchanged the exhibit with the County prior to trial. *See* Tax Court Rule 56 B(4).

According to the County, Becker's different overall value conclusions as between tax year 2017-18 ($32,000) and tax year 2018-19 ($43,000) indicate a market increase of 29.33 percent, which would result in a drastically different valuation had he adjusted his comparable sales for time. The County also argues that Becker failed to produce evidence to support his lot size adjustment of $2.00 per square foot, and the County notes Becker's admitted error in concluding significantly different values for Comparable B6 (2019)/ Comparable B5 (2018) based on the same transaction and the same property.

### 2.   *County's value analysis*

Kolen prepared a single written appraisal that used 10 comparable sales to determine the value of the Property as of January 1, 2017, and as of January 1, 2018.[13] Kolen testified that he did not have difficulty finding sales of comparable riverfront lots on the Siletz River. He adjusted his comparable sales for the difference in time between the date of sale and each January 1 assessment date, and he also adjusted for lot size, septic, and improvements. As discussed above, Kolen calculated his time adjustments using a six percent annual upward trend, which he derived from data in the County's annual ratio studies. Kolen also used data from a "double sales study,"[14] which he included in

---

[13] As mentioned above, the County also analyzed the actual sale of the Property as an indicator of value, starting with Plaintiff's asserted combined purchase price of $65,000 (ignoring any amounts he may have paid for personal property) and increasing that amount by percentages from the County's ratio studies, concluding RMVs of $76,950 for 2017-18 and $80,850 for 2018-19. Becker testified that the County's time trend percentage is not a reliable indicator of real market value because an oversupply of vacant land on the coast has caused the Property's value to plateau over time. A recent sale can be persuasive evidence of market value unless it is shown that the conditions affecting the value of real property have changed. *See, e.g.*, *Chart Development Corp. v. Dept. of Rev.*, 16 OTR 9, 13 (2001). The court declines to rely on the trended sale price because (1) Plaintiff purchased the Property as two separate tax lots in 2014 and 2015; (2) the County removed a structure from the RMV in tax year 2016-17, and (3) the County changed the square footage measurements of certain improvements in 2018. These changed conditions make Plaintiff's combined purchase price far less reliable than contemporaneous market comparisons.

[14] Kolen testified that the "double sales" study calculates the percentage time adjustment trend using data from properties that sold twice in two years without significant change to the property. Kolen also adjusted for size differences using a "double sales" study from a subdivision where lots were almost identical except for size.

evidence. Kolen adjusted $10,000 for the potential buildability of a property without septic approval and $7,500 for the cost installing a new septic system. Kolen calculated the value of the docks at the Property to be $53.30 per square foot based on the two recent "dock studies"[15] conducted in Lincoln County. He chose $20.00 per square foot to reflect physical depreciation on Dock 1. Kolen testified that his rate of depreciation was consistent with the residential dock valuation guide published by Marshall & Swift.[16] Kolen also provided the court with emails sent to Kolen from the assessor offices in Douglas County and Tillamook County as further support for his dock valuation.

In contrast to Becker's appraisals, Kolen's comparable sales are all Siletz River riverfront properties except for Comparable K10, which is located on the Salmon River. Comparable K1 sold for $95,000 on May 31, 2018. It is located 7.60 miles from the Property and includes a shed, a 261 square-foot dock, and septic in place. After adjustments, Kolen determined value indicators of $84,545 for 2017 and $90,245 for 2018. Comparable K2 is located 11.06 miles from the Property and sold for $55,000 on October 6, 2018. Kolen testified that he chose Comparable K2 in part because Lincoln County classified it as "unbuildable," which he considered a strong comparison for the Property based on Plaintiff's assertion that the Property itself is unbuildable. After adjustments, Kolen determined value indicators of $78,731 for tax year 2017-18 and $82,031 for 2018-19.[17]

Comparable K3 sold for $70,000 on October 24, 2018. Kolen testified that he chose this property because it is bare riverfront property located 8.42 miles from the

---

[15] Kolen testified that the "dock studies" tracked the cost that property owners paid for new docks in Lincoln County. Kolen also testified that he derived the square footage value of each of Plaintiff's docks by using an average cost per square foot of each class of the docks in the study.

[16] Kolen also testified that the overall values he concluded for Dock 1 and Dock 2 are less than the values indicated in Marshall & Swift. He explained that he did not apply the County's Local Cost Modifier (LCM) because the LCM relies on data from sales of new homes and new docks in Lincoln County.

[17] Kolen explained that he did not adjust downward for the presence of an unpermitted septic system on the property because the cost of removing it did not warrant a negative adjustment.

Property with a fence on site.[18] After adjustments, Kolen determined value indicators of $72,460 for 2017-18 and $76,660 for 2018-19. Comparable K4 is located 7.93 miles from the Property and sold for $65,000 on February 11, 2019. After adjustments, Kolen determined value indicators of $61,715 for 2017-18 and $65,615 for 2018-19. Comparable K5 sold for $90,000 on May 23, 2017. It is located 7.35 miles from the Property. After adjustments, Kolen concluded value indicators of $95,780 for 2017-18 and $101,180 for 2018-19.

Comparable K6 and Comparable K7 are each 1.94 miles from the Property. Neither property has any improvements. Comparable K6 sold for $84,500 on October 3, 2017. After adjustments, Kolen determined value indicators of $103,000 for tax year 2017-18 and $111,303 for tax year 2018-19. Comparable K7 sold for $79,800 on July 31, 2019. After adjustments, Kolen determined value indicators of $91,616 for 2017-18 and $96,803 for 2018-19.

Comparable K8 sold on July 2, 2018, for $115,000. It is located 1.06 miles from the Property and has no improvements. After adjustments, Kolen determined value indicators of $121,010 for 2017-18 and $127,910 for 2018-19. Comparable K9 sold for $165,000 on August 11, 2017. It is located 3.05 miles from the Property. After adjustments, Kolen determined value indicators of $159,335 for 2017-18 and $168,410 for 2018-19. Comparable K10 sold for $69,000 on October 19, 2018 and is located 17.59 miles from the Property, making it the farthest from the Property.

Comparable K10 has no dock, and the entrance to the river is non-navigable. Kolen testified that he included this property to show the range of prices property sells for in a different riverfront neighborhood. After these adjustments, Kolen determined value indicators of $92,392 for 2017-18 and $96,705 for 2018-19. Weighing the values of these 10 adjusted comparable sales, Kolen valued the Property at $77,000 as of January 1, 2017, and $82,000 as of January 1, 2018.

---

[18] Kolen explained that Comparable K3 and Comparable K4 are located directly across the Siletz River, making both properties substantially closer in distance to the Property than the driving distance shown on his written reports.

Plaintiff criticizes Kolen's analysis on several grounds. Plaintiff asserts that Kolen failed to adjust for multiple improvements in his comparable sales. Plaintiff argues that Kolen is not a registered appraiser and not qualified to determine real market value under state and federal law. Plaintiff urges the court to adopt Becker's opinion that the docks and improvements on the Property are of no value and argues that the dock data from other counties that Kolen used gave no indication as to how the other counties reached their conclusions.

E.    *Court's Analysis and Conclusion on RMV*

As the party challenging RMV, Plaintiff bears the burden of proof. *See Magno*, 19 OTR at 66; ORS 305.427. After considering the totality of the evidence, the court finds the County's appraisal more persuasive. As noted, Becker found two different values for the same transaction.[19] Becker also acknowledged that he erred by not adjusting Comparable B1 (2018) through Comparable B5 (2018) for water and septic after learning that the Property had water in place. Becker's view that no upward trending of value for comparable properties took place during the relevant period is contradicted by his own conclusion that the Property increased in value by $11,000 between two dates that he selected without regard to the statutory assessment dates of January 1, 2017, and January 1, 2018. Plaintiff made no attempt to rehabilitate Becker after the County pointed out these flaws. The court finds that Becker's errors go the level of care in his analysis and seriously undermine the reliability of his conclusions.[20]

Becker wrote in his appraisal reports that he was forced to look beyond the immediate market area because of a lack of comparable sales near the Property. ("This [expanded market search] could not be avoided due to such limited local market data from throughout all of same Lincoln

---

[19] Becker's oversight on Comparable B5 (2018) is particularly striking because he placed Comparable B5 (2018) before Comparable B6 (2018), indicating that Comparable B5 (2018) was the better comparable to the Property.

[20] Plaintiff's argument that Kolen is not certified to appraise real property is without merit and irrelevant to the RMV of the Property.

county."[21]) Kolen's appraisal, however, included recent Siletz River riverfront land sales in nine of its 10 comparable sales. Becker's appraisal for tax year 2017-18 included just two riverfront comparable sales: Comparable B5 (2018) and Comparable B6 (2018). The two riverfront comparable sales produce an average value to the Property of $71,250, an amount nearly equivalent to the County's $73,190 valuation of the Property as of January 1, 2017. Regarding improvements, both appraisers asserted that their dock valuations are supported by Marshall & Swift, but only Kolen produced evidence supporting his calculations and depreciation schedule. Kolen also relied on a "double sales" study in addition to his matched paired study; Becker did not use a double sales study and did not put any evidence of his matched paired data into evidence to support his testimony.

In his post-trial memorandum, Plaintiff cites to several documents that he claims demonstrate that Kolen failed to adjust his comparable sales for differences in improvements on the properties in the County's appraisal. These documents include photographs, property tax lot records, property tax lot surveys, maps, online real estate listings, and various permit applications and permit approvals.[22]

---

[21] Becker testified that vacant lots are not selling on the coast. He explained that the negative marketability made any increase in value "negligible." However, his appraisals themselves conclude that the RMV of the Property nonetheless appreciated in value from $32,000 in tax year 2017-18 to $43,000 in tax year 2018-19, a difference of $11,000.

[22] Regarding the photographs, Plaintiff claims that his witness, Tom Linstrom, took the photographs included with these exhibits. Plaintiff did not introduce these photographs during his cross-examination of Kolen, nor did Plaintiff produce evidence to prove that these photographs were taken on or near the assessment dates relevant to this case. Without that information, the court cannot compare the improvements identified in the photographs with the County's appraisal because Plaintiff did not prove that the improvements existed at the time Kolen appraised the comparable property. Plaintiff also relies on written statements in online real estate listings that Plaintiff appears to have downloaded from the internet. Plaintiff did not produce the authors of the property descriptions nor did he ask his expert witness to comment on the accuracy of the statements.

The property surveys, maps, inspection reports, permit applications, and permit approvals, are not in themselves indicative of the value of the comparable properties or the Property because Plaintiff made no attempt to connect that information with the RMV of the Property or the values in Kolen's appraisal. Plaintiff includes a "Lincoln County Property Report" (Property Report) for each

The court first notes that Plaintiff did not offer these documents into evidence in his case-in-chief, nor did he attempt to introduce them on his cross-examination of Kolen. For that reason, quite apart from other procedural issues, the court concludes that the exhibits have no probative value because Plaintiff did not subject them to the adversarial process. Finally, Plaintiff's expert witness, Becker, did not provide the court with alternative values for the improvements Plaintiff claims Kolen should have adjusted for in the County's appraisal.[23]

In sum, the court finds that the County's appraisal is reasonable, based on properties with characteristics and locations close to those of the subject Property, and using adjustments that are reasonably transparent or standardized. Plaintiff's appraisal is flawed as described above. The court concludes that Plaintiff has not met his burden to prove that the RMV of the Property for either tax year is lower than the values asserted by the County.

---

of the properties Kolen used as comparable sales in the County's appraisal. These Property Reports list information about each comparable property as of August 23, 2019. Like Plaintiff's photographs, the Property Reports do not counter Kolen's adjustments in the County's appraisal because the Property Reports do not prove the condition of the comparable property as of the assessment dates. *See* ORS 308.205(1) (defining real market value as "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the *assessment date* for the tax year") (emphasis added); *see Kem v. Dept. of Rev.*, 267 Or 111, 113-14, 514 P2d 1335 (1973) ("[r]eal property is assessed at its true cash value. True cash value means market value as of the assessment date"). Just as important, neither Plaintiff nor his expert witness provided the court with evidence of the *value* of the improvements listed on the Property Reports.

[23] Plaintiff argues that Kolen did not adjust Comparable K5 for the value of an "Elevation Certificate and Benchmark Survey" for flood insurance. Plaintiff values these two items at between $12,000 and $15,000 but provides no evidence supporting that valuation. Similarly, Plaintiff asserts that Comparable K5 through Comparable K9 are located in planned subdivisions or private communities where homes are valued at "$250,000," "$350,000," and "$375,000." Plaintiff's statements do not counter the County's evidence of value for those comparable properties because the County relies on data from arm's-length sales of those properties, while Plaintiff does not. *See, e.g., Ward v. Dept. of Rev.*, 293 Or 506, 510, 650 P2d 923 (1982) ("[t]he agreed price in a voluntary arm's-length sale of the assessed property, contemporaneous with the assessment, between a knowledgeable and willing buyer and seller is persuasive evidence of the property's market value").

## F.   *MAV Adjustments*

Plaintiff asks the court to order the department to reduce the MAV of the Property for tax years 2017-18 and 2018-19 to $65,000 based on square footage errors and the removal of the boathouse. The County asks the court to sustain the MAV on the roll ($117,770 for tax year 2017-18 and $114,890 for tax year 2018-19). The burden of proof is on Plaintiff because he is the party challenging the MAV on the roll for each tax year. ORS 305.427. Additional facts relevant to these issues are included below.

### 1.   *MAV correction for errors in square footage pursuant to ORS 311.234*

Plaintiff claims that an error in the County's recorded square footage for the Property, due to a failure to correctly take the high-water mark of the Siletz River into account, justifies a MAV reduction.[24] Oregon law allows correction of a property's MAV due to an error in square footage and certain other circumstances. ORS 311.234 provides, in relevant part:

"(1)   The current owner of property or other person obligated to pay taxes imposed on property may petition the county assessor for a correction of the maximum assessed value of the property for the current tax year for the circumstances described in subsection (2) of this section.

"(2)   The assessor shall correct the maximum assessed value of the property for the current tax year if, in the petition filed under this section, the petitioner demonstrates:

"(a)   A difference between the actual square footage of the property as of the assessment date for the current tax year and the square footage of the property as shown in the records of the assessor for the tax year.

"* * * * *

"(5)   A petition filed under this section must be on the form and contain the information prescribed by the

---

[24] In his post-trial brief, Plaintiff stated his position as follows: "The Land size adjustment is for our property size went from 10,890 Square Feet (1/4 of a acre) down to 5,028.8 Square Feet. We lost use of 5,861.2 Square Feet because the State of Oregon claimed everything below the High Water Means (Mark) * * *."

Department of Revenue and must be filed with the county assessor on or before December 31 of the current tax year.

"(6)   A decision by the assessor pursuant to a petition filed under this section may be appealed under ORS 305.275."

On December 16, 2015, a property survey of the Property, prepared for Plaintiff, was filed with the Lincoln County Surveyor's office (the "2015 Survey"). The 2015 Survey did not identify a mean high-water line and did not state a total square footage for the land. Relying on the 2015 Survey, the County recorded the square footage of the Property as 10,890 square feet, at least as of tax year 2017-18.[25] The County initially recorded the Property's MAV as $117,770 for both tax year 2017-18 and tax year 2018-19.

On December 12, 2017, taxpayer filed with the County a petition, on Department of Revenue form 150-310-092, to correct the MAV for the 2017-18 tax year due to square footage errors in the land and improvements. As filed, the petition did not include a land survey, although Plaintiff alleged that part of the land was "state owned" and "submerged & submersible." In a February 7, 2018, email to Plaintiff, Kolen asked: "Have you completed your survey of the Ordinary High Water Line?" On February 20, 2018, taxpayer delivered a survey of the Property ("2018 Survey") to the County in support of the petition, bearing the date February 19, 2018. The 2018 Survey identifies the mean high-water line and shows a "total area" of 5,028.8 square feet.[26]

For tax year 2017-18, the County declined to make any MAV correction, on the ground that Plaintiff's petition was untimely as to that tax year. The County treated the application as timely with respect to tax year 2018-19 and corrected the square footage of the land to 5,028 square feet for that year. The County found, however, that the change

---

[25]  Kolen at one point testified that the 2015 Survey showed the Property had a land square footage of "approximately 8,800 square feet."

[26]  Plaintiff's witness, Tom Linstrom, attempted in his testimony to identify a mean high-water line on earlier surveys of tax lot 301 and tax lot 501. The court found that Tom Linstrom was not qualified as an expert witness, and the court assigns no weight to his testimony on this point.

in recorded square footage had only a modest effect on the 2018-19 RMV because "[t]he physical usable area of the property remains unchanged and has the same utility today as it had the day it was purchased by the Plaintiff." The County also determined that there had been a net increase in the square footage of improvements of 59 square feet, which increased the MAV by $5,070, partially offsetting the diminution of value attributable to the reduction in recorded square footage of the land. Overall, the County reduced the MAV of the Property for tax year 2018-19 by $2,880, from $117,770 to $114,890.

### a.   Tax year 2017-18

The County rejected Plaintiff's petition for the tax year 2017-18 "due to the untimeliness of the application." The only express deadline in ORS 311.234 is the requirement in subsection (5) to file the petition "on or before December 31 of the current tax year," in this case, December 31, 2017. Plaintiff did file the petition form itself within that deadline for the tax year 2017-18. Plaintiff also appears to have satisfied the remaining requirements in subsection (5) of ORS 311.234, that the petition "be on the form and contain the information prescribed by the Department of Revenue." Plaintiff used the department's form and filled in answers to all questions on the form.[27] The court finds that the petition met the filing deadline requirements in subsection (5).

The court now turns to subsection (2) of ORS 311.234. That provision requires the assessor to correct the MAV "if, in the petition filed under this section, the petitioner demonstrates" that the actual square footage is different from that shown in the assessor's records. This provision places the burden on the petitioner to "demonstrate" the difference, and the petitioner must make that showing "in the petition." The court interprets these words based on their plain meaning, their context, and applicable legislative history. *See State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042

---

[27] The department's administrative rule under ORS 311.234 does not require anything beyond the questions on the form. *See* OAR 150-311-0240(2) ("[T]he assessor must receive a petition * * *. The petition must be filed with the county assessor on or before December 31 of the current tax year on a form prescribed by the department.").

(2009). To "demonstrate" means to clearly show something with evidence and reasoning.[28] Plaintiff's bare allegation in the petition of a square footage error, without any factual support, does not satisfy this requirement. The context of ORS 311.234 includes the deadlines throughout the year to which an assessor must adhere in order to record accurate values on the rolls for all properties and to enable annual billing and collection of local government revenue. The deadlines for the assessor are short and unforgiving, supporting a conclusion that the legislature likely intended the petitioner under ORS 311.234 to present a clear showing, supported by evidence and reasoning, by the December 31 deadline. *See Multnomah County Assessor v. Portland Devel. Comm.*, 20 OTR 395 (2011) (describing "annual and inexorable process" of property tax assessment).[29] Accordingly, the court concludes that subsection (2) of ORS 311.234 adds

---

[28] The dictionary definition of "demonstrate" is:

"to manifest clearly, certainly, or unmistakably : show clearly the existence of (even if both sides demonstrate a will to agree –*New Republic*)

"2a : to make evident or reveal as true by reasoning processes, concrete facts and evidence, experimentation, operation, or repeated examples (demonstrated that the geologic agencies are not explosive and cataclysmal but steady and patient –C. W. Eliot)

"b : to illustrate or explain in an orderly and detailed way especially with many examples, specimens, and particulars (demonstrate the essentials of the theistic position –W. R. Inge)

"3: to show or prove to a prospective customer (as by actual operation) the special value or merits of (an article or product)[.]"

*Webster's Third New Int'l Dictionary* 600 (unabridged ed 2002).

[29] The court has found no legislative history on point. *See* Or Laws 2001, ch 764 (requiring "demonstrated" square footage difference "[p]ursuant to" petition); House Journal, 71st Legislative Assemblyly, 2001 Regular Session, H-91, HB 2440 (2001); Minutes, House School Funding and Tax Fairness/Revenue Committee, Mar 2, 2001; Minutes, House School Funding and Tax Fairness/Revenue Committee, May 23, 2001; Minutes, House Committee on Rules, Redistricting, and Public Affairs, June 15, 2001; Audio, House School Funding and Tax Fairness/Revenue Committee, HB 2440, Mar 2, 2001, http://records.sos.state.or.us/ORSOSWebDrawer/Record/4143740; Audio, House School Funding and Tax Fairness/Revenue Committee, HB 2440, May 23, 2001, http://records.sos.state.or.us/ORSOSWebDrawer/Record/4145105; Audio, House Committee on Rules, Redistricting, and Public Affairs, June 15, 2001, http://records.sos.state.or.us/ORSOSWebDrawer/Record/4165197. In 2015, the legislature replaced the phrase "[p]ursuant to a petition" with the current phrase "in the petition." *See* Or Laws 2015, ch 39. The court has found no legislative history discussing that change. *See* testimony and exhibits available at https://olis.oregonlegislature.gov/liz/2015R1/Measures/Overview/HB2487.

a requirement regarding minimum content that must be included in a petition filed on or before December 31. Nothing in or attached to Plaintiff's petition as filed purported to demonstrate an error in the square footage of the land, and the new survey was not completed until seven weeks after the December 31, 2017, filing deadline. The court holds that the County was not required to change the MAV for tax year 2017-18 based on square footage, because Plaintiff's petition was incomplete, and therefore untimely, as of December 31, 2017, because the petition failed to include evidence demonstrating the square footage error.

The court does not reach this holding lightly. The court recognizes that a taxpayer embarking on a petition process may struggle to assemble everything needed to support the petition. And subsection (2) puts the assessor in a position to take a needlessly strict, or even unreasonable, view of whether the taxpayer has timely "demonstrated" the square footage difference in the as-filed petition. However, the court finds no evidence here that the County acted unreasonably in denying the petition. The 2018 Survey was indispensable to the County because it provided the sole factual support for Plaintiff's contention that the square footage of the land was wrongly recorded. Furthermore, the County appears to have "worked with" Petitioner for a time after the December 31, 2017, filing deadline, as evidenced by the February 7, 2018, email from Kolen to Plaintiff proactively inquiring about the status of the 2018 Survey. Finally, although the County rejected the petition for tax year 2017-18, it treated the petition as having been filed for tax year 2018-19, rather than insist on a new petition for that tax year.

b.    Tax year 2018-19

For tax year 2018-19, Plaintiff is dissatisfied with the County's $2,880 reduction of the MAV and asks the court to reduce it further to $65,000.[30] As to the land component of the reduction, the County did not produce evidence of its calculations; it simply explained that "[t]he physical

---

[30] Kolen also testified that the County recorded the addition of a fence to the Property on January 22, 2018. However, the addition of the fence did not affect the MAV because the County considered the fence to be "minor construction" under ORS 308.149.

usable area of the property remains unchanged and has the same utility today as it had the day it was purchased by the Plaintiff." Plaintiff did not address the County's reasoning or lack of data on his cross-examination of Kolen, nor did Plaintiff produce evidence showing a greater diminution in the value of the land due to the square footage reduction.[31] Accordingly, Plaintiff has not satisfied his burden to demonstrate that the County erred in its calculation as to the land.

Plaintiff also argued that the County erred in adjusting the MAV for the square footage of improvements. At trial, Plaintiff produced a spreadsheet created by his witness, Tom Linstrom. Tom Linstrom testified that he created the amounts shown in the spreadsheet using information from the County's records, and that these values demonstrate that the County incorrectly valued the square footage of improvements for several years predating the subject years.[32] The County disputes Tom Linstrom's testimony that the information in Exhibit 11 came from the County records. Plaintiff did not produce additional evidence that the information in Exhibit 11 came from the County's records, nor did Plaintiff ask his expert witness Becker to explain how Exhibit 11 supports Plaintiff's argument that the County improperly adjusted the MAV for errors in land square footage or improvements.[33] The court concludes that Plaintiff

---

[31] In his post-trial memorandum, Plaintiff criticizes the County's MAV calculation by reference to Becker's appraisal. Based on Becker's valuation of the land at $2.00 per square foot, Plaintiff asserts that the County should have adjusted the MAV downward by $11,722 rather than $2,880. Plaintiff reaches that number by multiplying the land square footage shown in the 2018 Survey (5,861.2 square feet) by $2.00: "5,861.2 x $2.00 = $11,722." But as noted above, Becker did not produce evidence of the matched pairing sales he relied on to determine a land size adjustment value of $2.00 per square foot; therefore, the court gives no weight to that adjustment value.

[32] As an example, Tom Linstrom testified that page 9 of Exhibit 11 demonstrates that the County incorrectly valued the "fir deck" as part of tax lot 301 when, according to Tom Linstrom, the fir deck was part of tax lot 501 from 1994 to 2015. According to Tom Linstrom, that mistake "that carried all the way through" until Plaintiff bought the Property. Neither Plaintiff nor Tom Linstrom attempted to demonstrate that the County relied on the allegedly incorrect values in Exhibit 11 when calculating the diminution in value of the land and improvements for the MAV in tax year 2018-19.

[33] Plaintiff appears to argue in his post-trial memorandum that Exhibit 11 relates to both tax year 2017-18 and 2018-19. Tom Linstrom did not state whether Exhibit 11 supports Plaintiff's argument that the County erred in calculating the MAV for tax year 2017-18, tax year 2018-19, or both. Nevertheless, for the reasons

has not carried his burden to prove a reduction of the MAV of the Property.

> 2. *MAV correction for removal of boathouse pursuant to ORS 308.146(8)*

Sometime prior to December 31, 2012, a boathouse[34] was physically removed from the Property.[35] (Plaintiff's application under ORS 308.146(8) stated that a "detached garage" was removed from the property "as of 12/31/2012.") On February 23, 2016, Kolen adjusted the 2016-17 RMV of the Property to reflect the fact that the boathouse was no longer on the Property. On December 12, 2017, Plaintiff filed an application for reduction of the MAV pursuant to ORS 308.146(8) to reflect the removal of the boathouse. The County argues that it did not correct the MAV because Plaintiff's application for the MAV correction was not timely.

The legislature has set out express restrictions governing when a taxpayer may apply for a reduction in MAV due to the removal of property. ORS 308.146(8) provides:

> "(a)  *** [W]hen a building is demolished or removed from property, *for the year in which the *** removal of the building is reflected by a reduction in real market value*, the maximum assessed value of the property may be reduced to reflect the *** removal of the building.

> "*****

> "(c)  To receive the reduction in maximum assessed value of the property under this subsection, the property owner must file an application with the county assessor

---

[34] stated above, the court concludes that Exhibit 11 does not demonstrate that the County erred in adjusting the MAV for land or improvements in either tax year 2017-18 or tax year 2018-19.

[34] The court refers to the structure that was physically removed from the Property as a "boathouse"; however, the court notes that Plaintiff also refers to the boathouse as a "detached garage." The name of the structure is not relevant to the court's opinion.

[35] Plaintiff also argues that he no longer owns one of the two docks on the Property and requests that the court order the County to remove the value of that dock from the MAV. Kolen testified that the County has no evidence that a dock has been removed from the Property and the Plaintiff produced no evidence showing that either of the docks has been sold. The court concludes that Plaintiff has not met his burden to prove a dock has been removed from his property.

after the *** removal and on or before *December 31 following the assessment date* if the *** removal occurred:

"(A)    Before the January 1 assessment date[.]"

*Id.* (emphasis added). Here, the boathouse was removed from the Property prior to 2013, and the County corrected the 2016-17 RMV to reflect the removal of the boathouse on February 23, 2016. ORS 308.146(8) required Plaintiff file any application to correct the MAV after the physical removal (*i.e.*, after December 31, 2012) and on or before December 31 following "the assessment date." In this case, the relevant assessment date is the assessment date "for the year in which the removal of the building is reflected by a reduction in real market value." *See* ORS 308.146(8). The County's RMV reduction applied to the tax year 2016-17, and the assessment date for that year was January 1, 2016. ORS 308.210(1), ORS 308.007. Therefore, Plaintiff's application for a MAV reduction was due on or before December 31, 2016. Plaintiff filed his application on December 12, 2017, nearly one year late. The court concludes that the County properly denied Plaintiff's application for a MAV correction under ORS 308.146(8).

G.    *Other Issues*

Plaintiff argues that Oregon "took 5,861 square feet" when the state "claimed" the land below the high-water mark without paying compensation to Plaintiff. Plaintiff bases this claim on the Plaintiff's 2018 Survey, which shows a total area of 5,028 square feet, which is 5,861 square feet less than the 10,890 square feet previously in the County's records. Plaintiff also cites various statutes which Plaintiff contends confer ownership of submersible land on the state. The court's jurisdiction to address this issue is limited to the MAV correction as discussed above. To the extent Plaintiff seeks compensation on the grounds that the state "took" the land below the high-water mark, this court cannot hear the claim. *See* ORS 305.410(1) ("the tax court shall be the sole, exclusive and final judicial authority for the hearing and determination of *all questions of law and fact arising under the tax laws of this state*") (emphasis added); *Sanok v. Grimes*, 294 Or 684, 701, 662 P2d 693

(1983) ("a claim is not one 'arising under the tax laws' unless it has some bearing on tax liability").

Plaintiff makes the additional argument in his post-trial memorandum that the 5,861 square feet of property is exempt from tax as riparian land under ORS 308A.356. Plaintiff did not address this issue at trial. Plaintiff's only evidence on this point is an application for property tax exemption for riparian lands he filed with the County pursuant to ORS 308A.356 on December 11, 2018. Plaintiff has not put forward evidence that he has interacted with the Department of Fish and Wildlife, much less complied with its standards and criteria for designation of land as riparian. *See* ORS 308A.356, ORS 308A.359. Nor has Plaintiff offered any other evidence that any portion of the Property is eligible for the exemption. The court concludes that Plaintiff has not met his burden to prove the Property is exempt under ORS 308A.652.

## IV.   CONCLUSION

The court concludes that Plaintiff has not met his burden to prove that the RMV or MAV of the Property should be reduced. The court also concludes that Plaintiff has not shown that the Property is entitled to exemption as riparian land. Any claim for compensation as a taking is outside the jurisdiction of this court. Now, therefore,

IT IS THE OPINION OF THIS COURT that for tax year 2017-18 the RMV is $73,190, the MAV is $117,770, and the AV is $73,190; and

That for tax year 2018-19 the RMV is $80,380, the MAV is $114,890, and the AV is $80,380; and

That Plaintiff's remaining claims for relief are denied.