IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| PARK DEVELOPMENT INC., | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 250404N |
| | ) | |
| v. | ) | |
| | ) | |
| CLACKAMAS COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **DECISION** |

Plaintiff appealed the real market value of property identified as Account 00931941

(subject property) for the 2024-25 tax year. A trial was held on November 3, 2025, in the

courtroom of the Oregon Tax Court. John Taylor (Taylor), broker, appeared and testified on

behalf of Plaintiff. Timothy Whiting (Whiting), licensed real estate broker, and Steve Roper

(Roper), civil engineer, also testified on behalf of Plaintiff. Tam Truong (Truong), senior

appraiser, appeared and testified on behalf of Defendant. Plaintiff's Exhibits labeled A through

C, E, and F were received over Defendant's objections to Exhibits A through C.[1] Defendant's

Exhibits A through K were received over Plaintiff's objection that Plaintiff did not receive the

exhibits.[2] Defendant's Rebuttal Exhibits L through S were received without objection.

I. STATEMENT OF FACTS

A. *Subject Property, Estacada Industrial Campus, Preliminary Subdivision Plat*

The subject property is a 22.49-acre parcel of industrial-zoned land within the Estacada

Industrial Park. (Def's Ex A at 4, 11.) Taylor determined the subject property had 19.45 usable

---

[1] Defendant objected to Plaintiff's Exhibit A based on its failure to conform to appraisal ethics rules, which are outside of this court's jurisdiction. Defendant objected to Exhibits B and C because Defendant disagrees that Plaintiff is required to install a sewer pump station. That issue goes to the weight given to the exhibits.

[2] The court confirmed that Defendant timely served the exhibits on Plaintiff at the correct mailing address provided to Defendant and the court. (*See* Certificate of Service to Def's Exhibits.)

acres excluding wetlands and area needed for a retention pond. (Ptf's Ex A at 4.) Whiting

testified that the subject property is in phases 2 and 3 of the campus development.[3] (*See* Ptf's Ex

B at 4, Ex C at 5.) A preliminary subdivision plat prepared in 2020 proposed to create 12 tax lots

on the subject property.[4] (Ptf's Ex B at 4; Def's Ex A at 12.) Whiting testified that the phase 2

and 3 plat for the subject property has been approved but not recorded.

The Estacada industrial campus "began development in 1997 and has the highest

concentration of industrial property in the area." (Def's Ex A at 16.) It includes 85 tax lots with

an average size of one acre, with a few five-acre parcels. (*Id.*) As of January 1, 2024, only two

industrial zoned tax lots over five acres were available. (*Id.*) The subject property, like the rest

of the campus, has "all utilities necessary for development (except natural gas) * * * available at

the street." (*Id.* at 16-17.) Whiting testified that the subject property does not have sewer access.

B.      *Costs of Developing Subject Property: Pump Station, Stormwater, Wetlands*

The City of Estacada (City) imposed additional requirements on development of the

subject property as a subdivision. (Ptf's cover letter, Ex C.) Taylor noted that several costs

resulting from those requirements are "above the normal development cost" for a subdivision,

notably a "[s]ewer pump station and forced main crossing the neighboring property to lift

station" at an estimated cost of $2,204,464. (Ptf's Ex A at 4.) Whiting confirmed that the pump

station is necessary to develop the subdivision.[5] Truong noted the pump station is required *only*

---

[3] The subject property was previously part of a larger, 43.47-acre parcel for which a preliminary plat in 2020 proposed a 22-lot subdivision. (*See* Ptf's Ex C at 4; Def's Ex A at 12.) In 2022, a 10-lot subdivision was recorded on 20.98 acres, leaving the subject property at 22.49 acres. (*See* Def's Ex A at 12)

[4] The 2020 plat approval with conditions had a four-year time limit, requiring a time extension in 2024. (Ptf's Ex C at 18.) Whiting testified that, in his experience, the City will typically grant the extension because they want to see industrial lots developed.

[5] Initially, there was a possibility that the City would place a new treatment facility north of the subject

DECISION  TC-MD 250404N                                                                    2

*if* the subject property is developed as a subdivision. (*See* Def's Ex S at 1 (email from City Senior Planner so stating).) Roper testified that he prepared the pump station cost estimate based in part on the price reported to him by a City engineer. (Ptf's Ex F.) He testified that the 20 percent contingency is based on the likelihood of encountering groundwater when connecting the sewer line and associated costs. Roper acknowledged that the pump station is necessary only if the subdivision is developed but noted that there would be costs associated with connecting the subject property to sewer lines even as a single parcel.

In addition to the pump station, Taylor noted that a one-acre storm water retention pond and stormwater swales are also required, but he did not provide an estimated cost for those items. (Ptf's Ex A at 4.) Roper testified that the City requires stormwater runoff at same rate as before development, but extensive paving can increase flows to downstream neighbors, so it's almost always necessary to create a retention pond. (*See also* Ptf's Ex C at 23 (City's storm drainage requirements in conditions of approval).) The subject property would need a pond, losing more land and costing more money.

The subject property includes 2.51 acres of wetland and wetland swales. (Def's Ex A at 17 (citing to AKS Engineering and Forestry LLC survey).) Roper testified that the subject property wetlands would likely cost between $200,000 and $400,000 to mitigate. Truong concluded that, "based on the 2020 preliminary plat, the wetlands [do] not impact the development of the subdivision into usable tax lots." (*Id.*) Yet, a comparison of the proposed plat with the wetlands map shows that the wetlands overlap several proposed lots. (*Compare* Def's Ex F with Ex K.) Truong did not attempt to account for wetland mitigation costs.

/ / /

---

property, allowing gravity flow to that facility, but the City ultimately selected a different location.

C.      *Sales Comparison Approach*

Both Taylor and Truong presented sales of undivided parcels that they considered comparable to the subject property. Taylor relied on two sales in Estacada and one in Happy Valley. (Ptf's Ex A at 3.[6]) Truong relied on four sales, located in Salem, Happy Valley, Canby, and Battle Ground, Washington. (Def's Ex A at 24-26.) The Happy Valley sale is the same.

1.      *Plaintiff's comparable sales*

Plaintiff's sale 1 was a 26.91-acre parcel in Estacada that sold for $2.99 per square foot on August 16, 2022. (Ptf's Ex A at 3.) Taylor testified that it was less than a half mile away from the subject property. He made a downward size adjustment and an upward location adjustment because sale 1 was further from the road with less exposure. (*See id.*) He found an adjusted price of $2.84 per square foot. (*Id.*) Whiting testified that he was the broker on a prior sale of the parcel in 2020. At the time of the 2020 sale, all utilities were stubbed but not extended, and the parcel was not platted. It did not yet have stormwater management and required expansion of an existing retention pond. It had no wetlands. (*See* Def's Ex P at 2 (sale confirmation).)

Truong also considered Plaintiff's sale 1, but did not rely on it as comparable because she concluded the seller was motivated and the sale was "off-market." (Def's Ex A at 27 (additional sale).) She confirmed the sale with the seller, learning that "the buyer and seller had a history of prior business dealings." (*Id.*) The buyer approached the seller directly and offered $4,000,000 for the property. (*Id.*) "Motivated by the need for quick capital to secure a down payment on a separate property, the seller agreed to a $3,500,000 sale price." (*Id.*) The buyer paid $1,500,000

---

[6] Plaintiff presented a fourth comparable sale of a 1-acre lot representing the value of a single lot after subdivision. (*Id.*) That sale is discussed below in the section *Sales of Subdivision Lots, Residual Land Value*.

cash and the seller offered "owner-carry financing for the remaining $2,000,000." (*Id.*) The seller thought the price was "fair" and both parties "were well informed." (Def's Ex P at 2 (sale confirmation).) The buyer ultimately recorded a 14-lot subdivision plat in May 2024 and incurred development costs to extend utilities to each lot and create a storm water facility. (Def's Ex A at 27, Def's Ex P at 1.[7]) To the extent an indicated value could be derived from the sale, Truong concluded it would be "significantly greater than $2.99 per square foot" based on the sale date and conditions of sale. (Def's Ex A at 27.)

Plaintiff's sale 2 was a 20.61-acre parcel in Estacada that sold for $2.22 per square foot on January 29, 2020. (Ptf's Ex A at 3.) Taylor testified that he thought it was zoned industrial, but Truong offered a zoning map showing that it was zoned residential. (Def's Ex L.)

Plaintiff's sale 3 was a 24.98-acre parcel in Happy Valley, that was pending for $6 per square foot. (Ptf's Ex A at 3.) Taylor testified that he was unsure if sale 3 closed. He made an upward size adjustment but testified he should have adjusted in the other direction. Taylor had concluded an adjusted price of $3.20 per square foot, but presumably that should be $3 per square foot based on his revision at trial. (*See id.*) Truong asked Taylor about his $1.00 per square foot zoning adjustment, noting that sale 3 is zoned industrial campus, like the subject property. (Def's Ex O.) Taylor was unable to explain the adjustment.

Taylor placed the most emphasis on sale 1, concluding $3 per square foot or $2,541,726 for the subject property. (Ptf's Ex A at 3.) He subtracted $2,204,464 for the pump station cost, yielding an indicated value of $337,262, which he rounded up to $400,000. (*Id.* at 4.)

///

///

---

[7] The appraisal states a 16-lot subdivision, but the confirmation states a 14-lot subdivision.

2.    *Defendant's comparable sales*

Truong determined that the subject property's highest and best use (HBU) was "industrial development." (Def's Ex A at 23.) She testified that she disagreed with Taylor that the subject property's HBU was to subdivide it. Based on her HBU conclusion, she did not subtract any development costs, including the pump station. (*See id.* at 24.)

Defendant's sale 1 was a 26.16-acre industrial parcel in Salem that sold for $4.66 per square foot on October 21, 2022. (Def's Ex A at 25.) The net useable area was 23.16 acres due to a water reservoir and setbacks. (*Id.*) Truong testified that sale 1 was purchased for truck storage. She considered the location superior to the subject property but the sale date inferior.

Sale 2 was a 35.95-acre industrial parcel in Battle Ground, Washington, that sold for $2.75 per square foot on September 22, 2022. (Def's Ex A at 25.) There were wetlands on site, but they did not impact the use or sale of the property. (*Id.*) Truong testified that the property was purchased for a church. She noted Battle Ground is a similar distance from the freeway.

Sale 3 was a 23.92-acre industrial parcel in Happy Valley that sold for $5.76 per square foot on March 28, 2024. (Def's Ex A at 26.) It is the same as Plaintiff's sale 3. Like the subject property, it was former farmland annexed into city. (*Id.*) The wetlands on site had no impact on the sale. (*Id.*) The City of Happy Valley purchased the site to build a public works facility and a PGE electrical substation, holding any remaining land for future use. (Def's Ex N.)

Sale 4 was an 11.28-acre industrial parcel in Canby that sold for $5.51 per square foot on July 26, 2024. (Def's Ex A at 26.) It was located on a gravel road and still needed some utility connections. (*Id.*) The useable area was 8.8 acres due to required river setbacks. (*Id.*) Truong testified that the buyer planned to build a warehouse.

/ / /

Truong made qualitative rather than quantitative adjustments to her sales and placed the most weight on sales 2 and 4 based on the similarity of each location. (Def's Ex A at 27.) She concluded a price of $4.40 per square foot or $4,310,522 for the subject property. (*Id.*)

Whiting testified in rebuttal of Truong's sales comparison approach. He noted that all her comparable sales were located far from Estacada in different markets. Estacada has no natural gas, which is a major issue for users heating large buildings; propane is cost-prohibitive for large spaces. Manufacturers often will not consider Estacada due to its distance from the interstate, resulting in higher trucking charges. Truong acknowledged those issues in her report stating, "[i]ndustrial development in [Estacada] has been somewhat limited due to its location away from heavily traveled interstates and arterials, distance from major employment centers, large population centers, the city's dated commercial infrastructure and lack of natural gas which is desirable for large manufacturers." (Def's Ex A at 15.) Yet, she testified that she believes there is demand in Estacada for a single user of a large site like subject property. Truong testified that some owners of one-acre lots have bought a second or third lot to expand.

3.     *Other market evidence: offers and listings*

Whiting testified that he offered Plaintiff $800,000 for the subject property. His offer reflected his understanding that the pump station is essential to developing the subdivision.

A 50.61-acre parcel of industrial land adjacent to the subject property was listed for $15,320,000 or $6.95 per square foot. (Def's Ex A at 28; Def's Ex G.) Whiting is the listing broker. He testified that it does not have the same stormwater issues as the subject property. Whiting has been listing it for $7 per square foot and getting "no action." He thought it was unlikely a buyer would pay $7 per square foot, but "miracles do happen." A 2018 deal for $7.7 million fell through because development costs were "horrendous" even for a single user.

DECISION  TC-MD 250404N                                                                              7

D.       *Sales of Subdivision Lots, Residual Land Value*

Both parties presented evidence concerning the market for sales of one-acre subdivision lots. Taylor testified that Plaintiff's sale 4 was a one-acre parcel in Estacada located close to the subject property in phase 1 of the park. It sold for $6.66 per square foot on February 2, 2022. (Ptf's Ex A at 3.) He adjusted it downward $2.50 per square foot for "development cost" and $1.00 per square foot for "risk and holding cost," concluding an indicated value of $3.16 per square foot. (*Id.*) Taylor testified that sale 4 was an example of a potential lot sale after the subject property is subdivided. Defendant questioned why Taylor selected a sale from 2022 when there were more recent sales. (*See* Def's Ex Q at 1 (2023 sales).) Whiting testified that fully developed one-acre lots sell for $8 to $9 per square foot.

Truong also considered individual lot sales through a residual land value approach that captured the "developer's perspective." (*See* Def's Ex H at 1.) From the "last 24 months," she found 14 sales in the Estacada Industrial Campus of tax lots ranging from 0.67 to 1.47 acres. (*Id.*) The median sale price was approximately $8.60 per square foot. (*Id.*) Truong applied that price to the subject property if subdivided into 12 lots, finding a value of $7,334,981. (*Id.*) She accepted Roper's cost of $2.2 million for the pump station but reduced his contingency from 20 percent to 10 percent for a revised cost of $2,020,759. (*Id.* at 2.) Truong subtracted a 15 percent developer's profit, concluding a value of $4,213,975. (*Id.*) Truong testified that she looked to Marshall and Swift for subdivision costs, finding they are $830,000 to $1.18 million, but that is not reflected in the report. She did not subtract any cost for wetlands mitigation.

E.       *Tax Roll, Property Value Appeals Board, Requested Values*

The subject property's 2024-25 real market value, sustained by the Property Value Appeals Board, was $2,909,658. (Compl at 3.) Its maximum assessed and assessed values were

$21,037.  (*Id.*)  Plaintiff requests a real market value of $400,000 but would accept $800,000 based on the recent offer.  Defendant requests a real market value of $4,310,522.

## II.  ANALYSIS

The issue before the court is the subject property's 2024-45 real market value.  "Real market value" is "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."  ORS 308.205(1).[8]  The assessment date was January 1, 2024, for the 2024-25 tax year.  ORS 308.007; ORS 308.210.  Real market value "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *."  ORS 308.205(2).  Three approaches to value must be considered but may not be applicable in every case: the cost approach; the sales comparison approach; and the income approach.  Oregon Administrative Rule (OAR) 150-308-0240(2)(a).  Both parties relied on the sales comparison approach in this case.

The party seeking affirmative relief bears the burden of proof by a preponderance of the evidence, which means "the greater weight of evidence, the more convincing evidence."  ORS 305.427; *Feves v. Dept. of Rev.*, 4 OTR 302, 312 (1971).  Here, Plaintiff bears the burden of proving a decrease in real market value, and Defendant bears the burden of proving an increase.

A.    *Highest and Best Use*

HBU is "the first issue"; "the market value of the property at that use" is "the second issue."  *Freedom Federal Sav. and Loan Ass'n v. Dept. of Rev.*, 310 Or 723, 727, 801 P2d 809 (1990).  HBU "means the reasonably probable use of vacant land * * * that is legally permissible, physically possible, financially feasible, and maximally productive, which results in

---

[8] The court's references to the Oregon Revised Statutes (ORS) are to the 2023 edition.

the highest real market value." OAR 150-308-0240(1)(e). An HBU "analysis 'is an economic study of market forces focused on the subject property.'" *STC Submarine, Inc. v. Dept. of Rev.*, 13 OTR 14, 18 (1994) (quoting Appraisal Institute, *The Appraisal of Real Estate* 276 (10th ed 1992)). "An appraiser determines the [HBU] of property by weighing market demand for the uses, products or services the property is designed to provide." *Id.* The HBU is "generally consistent with, and similar to, surrounding uses * * *. However, a property's [HBU] may be unusual or even unique." *Id.* at 19 (quoting *The Appraisal of Real Estate* at 289).

Neither appraiser presented a robust analysis of the subject property's HBU. Taylor presumed the subject property's HBU would be to develop a subdivision of 12 one-acre industrial lots, notwithstanding the significant development costs required. Taylor's conclusion is supported by the surrounding uses, particularly the development of 85 one-acre tax lots in the campus, and the active market for such lots. Truong concluded that the subject property's HBU would be to remain as a single, large industrial parcel. That use is out of sync with surrounding uses, and she was unable to provide any examples of similar uses in Estacada, such as for large manufacturing or warehouse space. Estacada's distance from the interstate and lack of natural gas explains why such uses were unlikely as of January 1, 2024. The court next considers comparable sales, placing emphasis on sales with the same HBU as the subject property.

B.     *Sales Comparison Approach*

"Under the sales comparison approach, the value of a property is derived by 'comparing properties similar to the subject property that have recently sold, are listed for sale, or are under contract * * *.'" *Linstrom v. Dept. of Rev.*, 24 OTR 223, 230 (2020) (quoting Appraisal Institute, *The Appraisal of Real Estate* 377 (14th ed 2013)). "The selection of properties for comparison is based on many factors, and adjustments are made for any differences between the

comparable properties and the subject property so that the appraiser can derive a value for the subject property." *Id.* (citing *Magno v. Dept of Rev*., 19 OTR 51, 58–59 (2006)).

Plaintiff's sale 1 is most similar to the subject property in size, location, and intended use. It sold for $2.99 per square foot in August 2022 and for a price less than the offer due to the seller's desire for quick capital. Both of those factors merit some upward adjustment.[9] The offer price of $4 million indicates a price of $3.41 per square foot, which was likely a low indicator as of January 1, 2024. Plaintiff's sale 3 was also used by Defendant, even though the intended use was for a public works facility and electrical substation, not a subdivision. It sold for $5.76 per square foot in March 2024. Both appraisers concluded a downward adjustment was required based on the superior location. Defendant's remaining sales ranged from $2.75 to $5.51 per square foot. The court gives those sales less weight because none were located in Estacada and each was intended for a different use than the subject property. Plaintiff's sale 2 is disregarded because it was in a residential zone. Overall, the sales presented indicate a value of $4 per square foot, or $3,918,656, before a reduction for the pump station cost.

The court places no weight on either the $800,000 offer for the subject property or the $6.95 per square foot listing of an adjacent industrial parcel totaling 50.61 acres. Neither had resulted in a sale as of the assessment date or even as of the trial date in this case. Whiting testified that the listing price was optimistic and had produced no interest.

Finally, the court is persuaded that the pump station is an extra cost required to develop the subject property as a subdivision and accepts Roper's estimate of $2,204,464. Subtracting that cost indicates a real market value of $1,714,192.

---

[9] The court disregards Taylor's adjustments, which were unsupported and potentially duplicative. For example, he adjusted sale 1 downward for "development costs" yet the parcel was not developed as a subdivision at the time of sale. The court instead uses qualitative adjustments to compare the sales.

## C.    *Residual Land Value*

Both appraisers considered lot sales as additional evidence of real market value.  Truong described this residual land value calculation as "a hypothetical valuation that assumes the [HBU] of the land is the development of the proposed 12 tax lots and then works backwards to estimate the value of the raw land."  (Def's Ex H at 1.)  Taylor performed a similar calculation based on the sale of a single subdivision lot in 2022.  The court places no weight on his analysis because it was based upon a single lot sale some time before the assessment date.  Truong's analysis is more persuasive.  She determined a sale price of $8.60 per square foot based on 14 lot sales.  That price is in line with Whiting's testimony that fully developed one-acre lots sell for $8 to $9 per square foot.  Truong concluded a total value of $7,334,981 for a 12-lot subdivision.

Truong subtracted most of the pump station cost estimate and 15 percent developer's profit, for a resulting value of $4,213,975.  (*Id.*)  She did not subtract any development costs, though she noted Marshall and Swift report costs of $830,000 to $1.18 million.  Accounting for the full pump station cost as well as typical development costs indicates a value of $3,030,270.[10] A further reduction for wetlands mitigation is supported and Roper estimated a cost of $200,000 to $400,000, indicating a value of $2,730,270.[11]

## D.    *Reconciled Real Market Value*

The sales comparison approach indicates a value $1,714,192 after adjusting for the cost of the pump station.  The court places less weight on the sales comparison approach based on the limited number of truly comparable sales.  The residual land value method indicates a value of $2,730,270.  The sale price of subdivision lots was well supported, though the costs associated

---

[10] That calculation is $7,334,981 (gross development value) less $2,204,464 (pump station cost) less $1,100,247 (developer's profit) less $1,000,000 (subdivision costs).  $3,030,270

[11] That calculation is based on the midpoint of Roper's cost range of $300,000.

with developing the subdivision were somewhat more speculative. Both approaches indicate that the tax roll real market value of $2,909,658 is overstated. The court concludes that the subject property's real market value was $2.5 million as of January 1, 2024.

### III. CONCLUSION

Upon careful consideration, the court concludes that the 2024-25 real market value of property identified as Account 00931941 was $2.5 million. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is granted in part. The 2024-25 real market value of property identified as Account 00931941 was $2.5 million.

_____

*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed. TCR-MD 19 B.*

*This Decision was signed by Presiding Magistrate Allison R. Boomer and entered on March 25, 2026.*